# Third District Court of Appeal

## State of Florida

Opinion filed February 1, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2758
Lower Tribunal No. 0026283468-02
_____


**Darrin E. McGillis,**
Appellant,

vs.

**Department of Economic Opportunity; and Rasier LLC, d/b/a UBER,**
Appellees.


An Appeal from the Department of Economic Opportunity.

Darrin E. McGillis, in proper person.

Shutts & Bowen LLP, and Daniel E. Nordby (Tallahassee), and Andrew E. Schwartz (Fort Lauderdale), for appellee Department of Economic Opportunity; Littler Mendelson, P.C., and Courtney B. Wilson, for appellee Rasier, LLC.


Before LAGOA, SALTER, and LOGUE, JJ.

LOGUE, J.

Darrin E. McGillis, a former Uber driver, appeals the decision of the Florida Department of Economic Opportunity concluding that an Uber driver is not an employee for the purpose of reemployment assistance. Because the parties' contract explicitly provides that an Uber driver is not an employee and the nature of the parties' relationship was consistent with this classification, we agree. We therefore affirm the Department's order denying McGillis' claim for reemployment assistance.

## FACTS AND PROCEDURAL HISTORY

Uber is a technology platform that connects drivers with paying customers seeking transportation services. McGillis served as an Uber driver until Uber revoked his access to the technology based on alleged violations of Uber's user privacy policy. McGillis then filed a claim for reemployment assistance against Rasier LLC, d/b/a Uber.[1] The threshold issue raised by McGillis' claim was whether he provided service to Uber as an employee entitled to reemployment assistance under section 443.1216, Florida Statutes (2015), or whether he served Uber as an independent contractor.

The Department of Revenue initially found that McGillis served as an Uber employee. Uber contested this determination, and an evidentiary hearing was held

---

[1] Rasier LLC is a wholly owned subsidiary of Uber Technologies, Inc., and holds a license to administer Uber Technologies' software in Florida. For purposes of simplicity, we refer to both Uber Technologies and Rasier as "Uber."

2

before the Department of Economic Opportunity. Following the hearing, a special deputy recommended a reversal of the Department's order. The special deputy found McGillis had served Uber as an independent contractor and was therefore not entitled to reemployment assistance. McGillis filed exceptions to the recommended order. In a detailed final order, the executive director of the Department of Economic Opportunity adopted the special deputy's recommended order and overruled McGillis' exceptions. McGillis filed this timely appeal.

At the hearing before the Department, witnesses explained in detail how Uber's transportation network software works. The software consists of two applications that are generally accessible on smartphones: a "user application," used by individuals seeking transportation services, and a "driver application," used by individuals willing to provide transportation services.[2] Drivers receive a percentage of the fare charged to the passengers,[3] and Uber processes payments to drivers weekly by direct deposit.

Uber supplies additional insurance coverage for commercial operation of a vehicle, but it does not provide other benefits such as medical insurance, vacation

---

[2] If a prospective driver does not own a smartphone, Uber may provide one to the driver with the driver application installed, but the driver is responsible for paying a deposit and a weekly fee.

[3] The fare is based on an algorithm developed by Uber. Variables include a minimum base fare, charges for mileage and time spent in transit, and a multiplier based on supply and demand in a particular location at a particular time.

pay, or retirement pay. At the end of each year, Uber sends each driver a "Form 1099"—an Internal Revenue Service form used to report payments to independent contractors—setting out the amounts paid to the driver for the year.

A prospective Uber driver must agree to the terms and conditions of Uber's "Software Sublicense and Online Agreement." This contract specifies that the driver is an independent contractor and not an employee. It further explains that the driver, as an independent contractor, is not entitled to unemployment benefits:

> This Agreement is between two co-equal, independent business enterprises that are separately owned and operated. The Parties intend this Agreement to create the relationship of principal and independent contractor and not that of employer and employee. The Parties are not employees, agents, joint venturers or partners of each other for any purpose. As an independent contractor, you recognize that you are not entitled to unemployment benefits following termination of the Parties' relationship.

The contract further specifies that each trip request accepted is considered a "separate contractual engagement," that drivers are "entitled to accept, reject, and select" requests as they see fit, and that drivers have no obligation to accept any request.[4] Drivers are free to set their own schedules and to determine what locations they will serve.

---

[4] Uber may deactivate the driver's account if the driver's acceptance rate is persistently below a specified level or after 180 consecutive days of inactivity. But even if deactivated, the driver may request reactivation of the account and return to using the driver application.

4

A prospective driver is subject to a background check and must provide Uber with information about the driver's vehicle, registration, license, and insurance. Drivers are responsible for supplying, maintaining, and fueling their own vehicles. Uber does not require drivers to display Uber signage in their vehicles, nor does Uber control the drivers' attire. Drivers are free to switch between using Uber's driver application and the application of a competitor, such as Lyft.

Uber does not directly evaluate or supervise its drivers. Instead, passengers rate their drivers on a scale ranging from one to five stars. If a driver's overall rating falls below the level set by the region's general manager and no improvement is shown, Uber may deactivate the driver's account.[5]

During his time as an Uber driver, McGillis experimented with when and where to use the driver application. He spent his own time and money investigating the most profitable times and locations. Uber did not reimburse him for any costs related to this market research, such as the cost of gas. And although McGillis left his previous job to use Uber's driver application, Uber did not require him to do so. Nor did Uber prohibit him from receiving ride requests from Lyft's driver application. In fact, McGillis switched between using Uber and Lyft at his discretion.

---

[5] Drivers also rate passengers on a similar scale. This score can affect a passenger's average rating, which drivers can view before accepting or rejecting a trip request.

Based on the testimony presented at the hearing, the Department's executive director concluded that Uber drivers were not employees. It noted that the drivers exercise a level of free agency and control over their work different from that of the traditional master-and-servant model indicative of an employer-employee relationship:

> The agreement between drivers and Uber specifies that the relationship is one of independent contractor, and the actual course of dealing confirms that characterization. Drivers have significant control over the details of their work. Drivers use their own vehicles and choose when, if ever, to provide services through Uber's software. Drivers decide where to work. Drivers decide which customers to serve. Drivers have control over many details of the customer experience. Drivers may provide services through, or work for, competing platforms or other companies when not using the Uber application. On these facts, it appears that Uber operates not as employer, but as a middleman or broker for transportation services.

Rasier, LLC v. Fla. Dept. Econ. Opportunity, 0026 2834 68-02 McGillis (Fla. Dept. Econ. Opp. Dec. 3, 2015) at 2.

## ANALYSIS

At the outset, we approve the executive director's observation regarding the changes rippling through our society as a result of the technology at issue:

> The internet and the smartphones that can now access it are transformative tools, and creative entrepreneurs are finding new uses for them every day. People are being connected in ways undreamed of just a decade ago. This is as true for business relationships (through software like Uber) as it is for social relationships (through software like Facebook). Many more people have access to, and voice in, markets that may once have been closed or restricted. Just as many more people can now publish their own thoughts to a vast audience,

> many more people can now offer their services or hawk their wares to a vast consumer base.

Id. at 19. In this case, we must decide whether a multi-faceted product of new technology should be fixed into either the old square hole or the old round hole of existing legal categories, when neither is a perfect fit.

The narrow issue on appeal is whether McGillis performed transportation services using Uber's software application as an "employee" within the meaning of Chapter 443. This determination is based on "the usual common-law rules applicable in determining the employer-employee relationship." § 443.1216(1)(a)(2). "The statute does not refer to other rules or factors for determining the employment relationship." Brayshaw v. Agency for Work Force Innovation, 58 So. 3d 301, 302 (Fla. 1st DCA 2011). Accordingly, the Department was "limited to applying only Florida common law in determining the nature of the employment relationship." Id.[6]

---

[6] An administrative agency's interpretation of a statute it is charged with enforcing is generally entitled to great deference. Donato v. Am. Tel. & Tel. Co., 767 So. 2d 1146, 1153 (Fla. 2000); Metro. Dade Cty. v. P.J. Birds, Inc., 654 So. 2d 170, 175 (Fla. 3d DCA 1995). Under this doctrine, courts defer to the agency because "the interpretation may have been based on a history that is best known by the agency or special expertise the agency has in applying the statute." Brown v. State, Comm'n on Ethics, 969 So. 2d 553, 557 (Fla. 1st DCA 2007). Deference is not required, however, if the agency's interpretation conflicts with the statute's plain meaning or requires no special agency expertise. Arza v. Fla. Elections Comm'n, 907 So. 2d 604, 606 (Fla. 3d DCA 2005).

To determine whether an individual is an employee or independent contractor, Florida law requires courts to initially look to the parties' agreement. Keith v. News & Sun Sentinel Co., 667 So. 2d 167, 171 (Fla. 1995). If a provision disclaims an employer-employee relationship in favor of independent contractor status, courts honor that provision "unless other provisions of the agreement, or the parties' actual practice, demonstrate that it is not a valid indicator of status." Id. If the parties' actual practice contradicts their written agreement, the actual practice controls. Id.

Indeed, independent contractor or employee status "depends not on the statements of the parties but upon all the circumstances of their dealings with each other." Cantor v. Cochran, 184 So. 2d 173, 174 (Fla. 1966). So to determine whether the parties practice an independent contractor or employee-servant relationship, Florida courts consider several factors outlined in the Restatement (Second) of Agency § 220. Id. at 174-75. The Restatement lists the following ten factors:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;

8

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

In examining these factors, it is not uncommon for a court to find that not "every element [of the Restatement] is so clearly present as to establish beyond argument that the arrangement between [the parties] is one of independent contractorship" or employer-employee. Miami Herald Publ'g Co. v. Kendall, 88 So. 2d 276 (Fla. 1956). But among these ten factors, the "extent of control" is recognized by Florida courts as the most important factor in determining whether a person is an employee or independent contractor. Verchick v. Hecht Invs., Ltd., 924 So. 2d 944, 946 (Fla. 3d DCA 2006) ("It is well-established that the main test in determining the existence of an employer-employee relationship is whether the employer has direction and control over the employee."). "Control" refers to "the right to direct what shall be done and how and when it shall be done." Herman v. Roche, 533 So. 2d 824, 825 (Fla. 1st DCA 1988).

9

Of course, both employees and independent contractors "are subject to some control by the person or entity hiring them. The extent of control exercised over the details of the work turns on whether the control is focused on simply the result to be obtained or extends to the means to be employed." Harper ex rel. Daley v. Toler, 884 So. 2d 1124, 1131 (Fla. 2d DCA 2004) (citation and quotations omitted). "[I]f control is confined to results only, there is generally an independent contractor relationship . . . ." 4139 Mgmt. Inc. v. Dep't of Labor & Emp't, 763 So. 2d 514, 517 (Fla. 5th DCA 2000). By contrast, "if control is extended to the means used to achieve the results, there is generally an employer-employee relationship." Id.

For example, in A Nu Transfer, Inc. v. Department of Labor & Employment Security Division of Employment Security, 427 So. 2d 305 (Fla. 3d DCA 1983), this court held that an owner-operator truck driver for an inland carrier was an independent contractor because drivers provided their own vehicles, were not required to work a specific number of hours, and were permitted to work for a competitor company. And in Jean M. Light Interviewing Services, Inc. v. State Department of Commerce, 254 So. 2d 411 (Fla. 3d DCA 1971), this court held that interviewers for market research were independent contractors because they were "free" to refuse a job, to work for competitors, and to complete an assignment "at such time and in such matter, or fashion, as the interviewers might desire." Id. at 412-13.

10

Similarly, in 4139 Management Inc., 763 So. 2d at 518, the Fifth District held that condominium housekeepers were independent contractors because they controlled the means to completing a job, were free to refuse a job, and could simultaneously "work for others." Id. at 518. See also Sarasota Cnty. Chamber of Commerce v. State Dep't of Labor & Emp't Sec., Div. of Unemployment Comp., 463 So. 2d 461, 462-63 (Fla. 2d DCA 1985) (concluding salespersons were independent contractors because there was "no meaningful supervision over the salespersons' work"; salespersons "set their own schedules and contact such prospects as they please," "furnish and pay for their own transportation," "are free to hire others at their own expense," and "dress in whatever fashion they desire"); VIP Tours of Orlando, Inc. v. State Dep't of Labor & Emp't Sec., 449 So. 2d 1307, 1310 (Fla. 5th DCA 1984) (concluding tour guides were independent contractors because they were free to reject an assignment, free to determine the nature of each tour, and "free to work for other tour services"; the tour company "had no right of control over the tour guides other than to require them to show up at a particular place at a particular time wearing the [company] uniform and to travel in [company] transportation").

We agree with the Department's conclusion that Uber drivers like McGillis are not employees for purposes of reemployment assistance. Here, the parties' agreement unequivocally disclaims an employer-employee relationship. And the

11

parties' actual practice reflects the written contract. As the Department here found, "the central issue is the act of being available to accept requests" and "[t]his control is entirely in the driver's hands." Drivers supply their own vehicles—the most essential equipment for the work—and control whether, when, where, with whom, and how to accept and perform trip requests. Drivers are permitted to work at their own discretion, and Uber provides no direct supervision. Further, Uber does not prohibit drivers from working for its direct competitors. Accordingly, we agree with the Department's assessment that,

> [a]s a matter of common sense, it is hard to imagine many employers who would grant this level of autonomy to employees permitting work whenever the employee has a whim to work, demanding no particular work be done at all even if customers will go unserved, permitting just about any manner of customer interaction, permitting drivers to offer their own unfettered assessments of customers, engaging in no direct supervision, requiring only the most minimal conformity in the basic instrumentality of the job (the car), and permitting work for direct competitors.

Rasier, LLC v. Fla. Dept. Econ. Opportunity, 0026 2834 68-02 McGillis (Fla. Dept. Econ. Opp. Dec. 3, 2015) at 11.

Additional facts of this case support this conclusion. For example, Uber sends each driver a Form 1099—an IRS form used to report payments to independent contractors. See 4139 Mgmt., 763 So. 2d at 518 ("At the end of the year, the Association gave the maids a Form 1099 'Miscellaneous Income' for the maids to report their income."). And Uber does not provide fringe benefits, such as medical

insurance, vacation pay, or retirement pay. See A Nu Transfer, 427 So. 2d at 306 ("[The truck drivers] do not accrue and are not paid for sick leave or vacation time."); 4139 Mgmt., 763 So. 2d at 518 ("The maids did not receive any benefits such as vacation, sick leave or insurance . . . ."); Dep't of Health & Rehab. Servs. v. Dep't of Labor & Emp't Sec., 472 So. 2d 1284, 1287 (Fla. 1st DCA 1985) (noting that the independent contractor housekeeper "did not receive fringe benefits, such as insurance, as part of her compensation . . . ."); La Grande v. B & L Servs., Inc., 432 So. 2d 1364, 1367 (Fla. 1st DCA 1983) ("[The taxicab company] provided [the taxicab driver] no fringe benefits of the kind usually found in an employment relationship.").

The fact that Uber may deactivate a driver's account under certain circumstances does not mandate a contrary conclusion. See, e.g., La Grande, 432 So. 2d at 1368 ("[W]e recognize that the ability to terminate such a relationship at will without incurring liability is an attribute more characteristic of an employment situation than that of independent contractor. However, although a factor to be considered, it is by no means conclusive on the issue of independent contractor versus employee status."). And even though Uber's principal business is to provide transportation, this factor alone is not dispositive. See Jean M. Light Interviewing Servs., 254 So. 2d at 412-13 (holding interviewers were not employees even though interviewing was the principal business of the interviewing service).

13

**CONCLUSION**

Uber and McGillis contractually agreed that McGillis' work did not make him an employee. A review of the parties' working relationship confirms this understanding. Due in large part to the transformative nature of the internet and smartphones, Uber drivers like McGillis decide whether, when, where, with whom, and how to provide rides using Uber's computer programs. This level of free agency is incompatible with the control to which a traditional employee is subject. Accordingly, we affirm the final order of the executive director of the Department of Economic Opportunity concluding that Uber drivers are not entitled to reemployment assistance under section 443.1216 and denying McGillis' claim for reemployment assistance.

Affirmed.